JUAN ARIAS *v.* JEFFREY GEISINGER
(AC 31565)

Bishop, Harper and Pellegrino, Js.

Argued October 29, 2010—officially released March 1, 2011

*Proloy K. Das*, with whom, on the brief, were *Zisca R. St. Clair* and *Jonathan R. Chappell*, for the appellant (defendant).

*Lester Katz*, with whom, on the brief, was *James A. Armentano*, for the appellee (plaintiff).

*Opinion*

PELLEGRINO, J. The defendant, Jeffrey Geisinger, appeals from the judgment of the trial court rendered in favor of the plaintiff, Juan Arias, for injuries resulting from the negligence of the defendant. On appeal, the defendant argues that the court improperly determined that the plaintiff's claims were not barred by General

Statutes § 31-293a.[1] We affirm the judgment of the trial court.

Based on the stipulations of the parties, supplemented by testimony and evidence at trial, the court found the following facts. The plaintiff and the defendant were fellow employees at Meridian Operations, LLC (Meridian), a tire recycling company in Plainfield. Early in the morning of June 6, 2005, the plaintiff was seriously injured when the rear passenger side door of a cargo container (container) that was being moved by a vehicle operated by the defendant struck a wooden beam that supported a canopy under which the plaintiff was working, dislodging the wooden beam and causing it to strike the plaintiff.

At the time of the incident, the defendant and the plaintiff were acting within the scope of their employment. The plaintiff was working in the rear of Meridian's building, where tires were moved on a conveyor belt out of the building and into a loading dock. The tires would be loaded into the container, which was open on top and closed on both sides, with doors on the rear wall. The rear doors could be opened to allow the loading of cargo and closed and secured to prevent the cargo from falling out while in transit. The container was fastened by several bolts to a trailer chassis (chassis), which was essentially a flat bed on four wheels.[2]

---

[1] General Statutes § 31-293a provides in relevant part: "If an employee . . . has a right to benefits or compensation under this chapter on account of injury or death from injury caused by the negligence or wrong of a fellow employee, such right shall be the exclusive remedy of such injured employee or dependent and no action may be brought against such fellow employee unless such wrong was wilful or malicious or the action is based on the fellow employee's negligence in the operation of a motor vehicle as defined in [General Statutes §] 14-1. For purposes of this section, contractors' mobile equipment such as bulldozers, powershovels, rollers, graders or scrapers, farm machinery, cranes, diggers, forklifts, pumps, generators, air compressors, drills or other similar equipment designed for use principally off public roads are not 'motor vehicles' . . . ."

[2] The court noted that there was disagreement between the testimony of the plaintiff's expert and Guy Mozzicato, the president of Meridian at the

The container-chassis unit (trailer) was backed into the loading bay, flush with the loading dock, while the rear doors of the container were fully open and folded along its sides to receive the tires. It was the open door on the passenger side of the trailer that struck and dislodged the beam.

The incident occurred during the loading process, while the trailer was being moved away from the loading dock. In order to move the trailer, it was attached to a yard truck,[3] which the defendant drove away from the loading dock with the trailer in tow. While the trailer was being towed, the container struck and dislodged the support beam that inflicted substantial injuries to the plaintiff.

On February 13, 2009, the plaintiff filed his operative amended complaint that alleged that his injuries were caused by the defendant's negligence.[4] On February 27, 2009, the defendant filed his operative amended answer and a special defense, which asserted that the plaintiff was precluded from recovery for his injuries pursuant to § 31-293a because the defendant, at the time of the incident, was not operating a motor vehicle as defined by General Statutes § 14-1. Prior to trial, the parties stipulated that the defendant was negligent in his movement of the container, that his negligence caused the

time of the incident, as to whether the bolts fixing the container to the chassis were permanently welded. The court determined that, regardless of whether the container and chassis were permanently attached, they constituted one unit (trailer).

[3] The court described the yard truck as "a single cab vehicle, considerably smaller than the full-size tractor that would normally be used to tow a [trailer] the size of the [trailer] in question on the highway." The defendant's expert witness described the yard truck as a "specialized truck tractor that is used for 'spotting' or moving semitrailers or containers in a more efficient manner than a semitractor around a terminal or facility." The yard truck had its own gasoline engine and acceleration system, as well as a compressor and air hoses, which, when attached to the trailer, activated the brakes on the chassis portion of the trailer.

[4] The plaintiff's initial complaint was filed on October 18, 2006.

plaintiff's injuries and that the fair, just and reasonable compensation for his injuries was $1.2 million. On February 26 and 27, 2009, the court heard evidence from Michael Cei, an accident reconstructionist; Guy Mozzicato, the president of Meridian at the time of the incident; and the defendant. On September 18, 2009, the court, *Hon. Joseph M. Shortall*, judge trial referee, issued a memorandum of decision in which he concluded that the plaintiff's injuries were caused by the negligent operation of a motor vehicle and rendered judgment in favor of the plaintiff in the amount of $1.2 million. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant argues that the court improperly determined that § 31-293a does not bar the plaintiff's claims. We disagree. Our Workers' Compensation Act (act), General Statutes § 31-275 et seq., "is the exclusive remedy for injuries sustained by an employee arising out of and in the course of his employment. . . . General Statutes § 31-284 (a). Under the act's strict liability provisions, workers are compensated without regard to fault. In return for a relatively low burden of proof and expeditious recovery, employees relinquish their right to any common-law tort claim for their injuries. . . . Generally, then, all rights and claims between employers and employees, or their representatives or dependents, arising out of personal injury or death sustained in the course of employment are abolished as a result of the act's exclusivity bar.

"Another provision of [this state's] act, [namely] . . . § 31-293a, creates an exception, however, to the otherwise applicable exclusivity bar. In relevant part, § 31-293a provides that [i]f an employee . . . has a right to benefits or compensation . . . on account of injury or death from injury caused by the negligence or wrong of a fellow employee, such right shall be the exclusive remedy of such injured employee or dependent and no

action may be brought against such fellow employee unless such wrong was wilful or malicious or the action is based on the fellow employee's negligence in the operation of a motor vehicle. . . . As we explained in *Colangelo* v. *Heckelman,* 279 Conn. 177, 183–84, 900 A.2d 1266 (2006), if an employee suffers injuries, which otherwise would be compensable under the act, due to the negligence of a fellow employee, the injured employee is barred from recovery against that fellow employee unless the injuries were caused by the fellow employee's negligent operation of a motor vehicle [as defined in § 14-1]." *Jaiguay* v. *Vasquez,* 287 Conn. 323, 328–29, 948 A.2d 955 (2008).

Thus, our resolution of the defendant's claim requires us to discern the meaning of § 31-293a, as applied to the factual scenario presented, to determine whether the plaintiff was injured because of the defendant's negligent operation of a motor vehicle. Such "[i]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not

be considered. . . . When the language of a statute is not plain and unambiguous, we look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to . . . common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Cruz* v. *Montanez*, 294 Conn. 357, 367–68, 984 A.2d 705 (2009).

We begin, therefore, with the language of § 31-293a to determine whether the court properly determined that the plaintiff fell within the exception to the exclusive remedy of workers' compensation. Our review of the defendant's claim hinges on two specific questions: (1) was the accident caused by a motor vehicle and, if so, (2) did the defendant operate that motor vehicle?

Preliminarily, we agree with the court's finding of fact that the container and the chassis together constitute what we have referred to as the trailer. As the court stated in its memorandum of decision, "[t]he photograph of the [trailer] in evidence shows that the container was identified by a plate carrying the number 1111. That number appears on all of the vehicle registrations from [February] 2005, through [February] 2011, along with the chassis' [vehicle identification number] number, as the identification of the vehicle being registered. Likewise, it appears on all the department of transportation inspection reports from 2002 through 2006, indicating the vehicle identification along with the [vehicle identification number] of the chassis portion of the [trailer]. The plaintiff's expert testified that the same number, 1111, appeared on the container attached to the chassis on the day he physically inspected the [trailer], January 29, 2009, and photographed the registration certificate affixed to the chassis. . . . Mozzicato, president of Meridian at the time of the incident, referred to the unit throughout his testimony about the incident

and Meridian's vehicle records, and made it clear that he was referring to the unit of the chassis and the container. This evidence satisfies the court that the unit of container and chassis was an essentially permanent unit and not one that happened to have been assembled that day for [the defendant's] use." (Internal quotation marks omitted.)

To address whether the trailer in this case constituted a motor vehicle, § 31-293a directs us to § 14-1. Section 14-1 (53) in relevant part defines a "motor vehicle" as "any vehicle propelled or drawn by any nonmuscular power, except aircraft, motor boats, road rollers, baggage trucks used about railroad stations or other mass transit facilities, electric battery-operated wheel chairs when operated by physically handicapped persons at speeds not exceeding fifteen miles per hour, golf carts operated on highways solely for the purpose of crossing from one part of the golf course to another, golf-cart type vehicles operated on roads or highways on the grounds of state institutions by state employees, agricultural tractors, farm implements, such vehicles as run only on rails or tracks, self-propelled snow plows, snow blowers and lawn mowers, when used for the purposes for which they were designed and operated at speeds not exceeding four miles per hour, whether or not the operator rides on or walks behind such equipment, bicycles with helper motors as defined in section 14-286, special mobile equipment as defined in subsection (i) of section 14-165, mini-motorcycles, as defined in section 14-289j, and any other vehicle not suitable for operation on a highway . . . ."[5] Section 14-1 (100) in relevant part defines a "vehicle" to include "any device suitable for the conveyance, drawing or other transportation of persons or property, whether operated on

---

[5] Although § 14-1 (53) states that the definition of "special mobile equipment" can be found in subsection (i) of General Statutes § 14-165, that definition is actually contained in § 14-165 (9).

wheels, runners, a cushion of air or by any other means. The term does not include devices propelled or drawn by human power or devices used exclusively on tracks . . . ."

Thus, to conclude that the trailer involved constituted a motor vehicle, a careful path through the plain text of the statute requires us to determine whether the trailer was (1) suitable for transportation of persons or property, (2) propelled or drawn by any nonmuscular power, (3) suitable for operation on a highway and (4) not one of the enumerated vehicles specifically excluded from the definition of a motor vehicle by any of the aforementioned statutes.

First, we conclude that the trailer was a vehicle suitable for transportation of property. The parties stipulated that "[p]rior and subsequent to June 6, 2005, the [t]railer was used many times on a public road or highway to transport property." Further, at the time of the accident, it was being used to transport scrap tires to an energy plant in Sterling for recycling. We also conclude that the trailer was drawn by nonmuscular power.[6] Although the parties stipulated prior to trial that the yard truck was not a motor vehicle as defined in § 14-1, the yard truck provided "nonmuscular" power

---

[6] The defendant, through an exhaustive presentation of dictionary definitions and case law on statutory interpretation, argues that the plain and common meaning of the term "motor vehicle" requires that, as a predicate, there be a motor or ability to self-propel. Although such an interpretation would seem logical on its face, the specific statute relevant in this case defines a motor vehicle in relevant part as "any vehicle propelled *or drawn by any nonmuscular power* . . . ." (Emphasis added.) General Statutes § 14-1 (53).

In *Colangelo* v. *Heckelman*, supra, 279 Conn. 192–93, our Supreme Court has specifically stated that the term "motor vehicle, as that term is defined in § 14-1 [53] and limited under § 31-293a . . . is clear and straightforward . . . ." (Internal quotation marks omitted.) In following § 1-2z, we simply cannot ignore that the definition of motor vehicle pertinent to this case, as stated in § 14-1 (53), is plain and unambiguous and, thus, that a motor vehicle does not require a motor or ability to self-propel.

to tow the trailer. In fact, as the trial court found, "[the trailer's] size is such as to require that it be drawn by 'nonmuscular' power, i.e., that a piece of equipment, such as a tractor, has to be attached to it in order for it to be drawn or propelled forward."

Likewise, in concluding that the trailer was suitable for operation on a highway, we adopt the court's well reasoned analysis in its memorandum of decision: "It is the design of a vehicle that determines whether it is suitable for operation on a highway. *Pinheiro* v. *Board of Education*, [30 Conn. App. 263, 272–73, 620 A.2d 159 (1993)]. [Cei] testified without contradiction that the chassis to which the container was attached to make up the [trailer] was designed for operation on a highway in that it had the required equipment for such use. It had tail and brake lights, lights in the center of the chassis to illuminate the rear of the unit, an ICC bar, a protective mechanism to prevent following vehicles from riding under the rear of the chassis, mud flaps to keep dirt and debris from flying onto trailing vehicles, and pneumatic rubber tires for highway use. It had its own suspension and braking systems, the latter activated via hookup to a towing vehicle.

"The parties stipulated that the chassis portion of the unit was inspected annually by the United States Department of Transportation and that it was routinely maintained and repaired. These steps were taken in order to ensure its continued safety for operation over the public highway. Moreover, the parties stipulated that, at the time of the incident, it was properly registered in Maine and had attached to it a Maine license plate, another requirement for it to be suitable for operation on a highway. Finally, the parties stipulated that, prior and subsequent to June 6, 2005 [the date of the incident], the [chassis] was used many times on a public road or highway to transport property." (Internal quotation marks omitted.)

Last, we must determine whether the trailer qualified as one of the vehicles specifically excluded from the definition of a motor vehicle by General Statutes §§ 31-293a, 14-1 (53) or 14-165 (9).[7] Because the trailer was operated on wheels and used for the transportation of property, the vehicle comes under the language of § 14-1 (53). In reading subsection (53) of § 14-1, and after concluding that the trailer was drawn by nonmuscular power, we must determine whether the trailer falls under any exception listed in that statute, most specifically, the definition of "special mobile equipment." Given that § 14-165 (9) defines "special mobile equipment" as a vehicle *not* designed for the transportation of property on a highway and because we have already determined that the trailer was a vehicle designed for the transportation of property on a highway, we conclude that the trailer does not meet the definition of special mobile equipment. Therefore, based on the clear and unambiguous meaning of §§ 31-293a, 14-1 (53) and 14-165 (9), as applied to the factual scenario presented, we conclude that the court properly determined that the trailer involved in this case constituted a motor vehicle.

We are, thus, left to determine whether the defendant, by driving the yard truck that towed the trailer at the time of the incident, operated a motor vehicle—the trailer. The issue of whether the defendant was engaged

---

[7] General Statutes § 14-165 (9) in relevant part defines "special mobile equipment" as "a vehicle *not designed for the transportation of* persons or *property upon a highway* and only incidentally operated or moved over a highway, including, but not limited to, ditch-digging apparatus, well-boring apparatus and road construction and maintenance machinery such as asphalt spreaders, bituminous mixers, bucket loaders, street sweepers, tractors other than truck tractors, ditchers, leveling graders, finishing machines, motor graders, road rollers, scarifiers, earth moving carry-alls and scrapers, power shovels and drag lines, and self-propelled cranes and earth moving equipment. The term does not include house trailers, dump trucks, truck-mounted transit mixers, cranes or shovels, or other vehicles designed for the transportation of persons or property to which machinery has been attached . . . ." (Emphasis added.)

in the operation of a motor vehicle at the time of the incident is an issue of law. See *Surprenant* v. *Burlingham*, 64 Conn. App. 409, 416, 780 A.2d 219 (2001). In *Cirillo* v. *Sardo*, 41 Conn. App. 664, 669–70, 676 A.2d 1388, cert. denied, 239 Conn. 904, 682 A.2d 998 (1996), this court stated that "[o]peration of a motor vehicle connotes the control and direction of it, the activity of an operator or driver licensed for that purpose. The exception to § 31-293a relates to injury causally connected to the control and direction of the employer's vehicle." (Internal quotation marks omitted.) "In order to find such negligent operation allowing supplementary tort recovery against the employee operator within the exclusion of § 31-293a, the fellow employee's injury must have been caused by the negligent movement or circumstance resulting from the movement of the employer's truck." (Internal quotation marks omitted.) Id., 668.

In its memorandum of decision, the trial court found that the defendant controlled and directed the trailer: "Here, the actions of [the defendant] in towing the [trailer] away from the loading dock constituted the 'operation' of the [trailer] because it was he who controlled and directed the movement of the [trailer] by the manner in which he drove the yard truck. He testified that, in order to move the [trailer] away from the loading dock, he had to pull it forward and direct it to the left in order to clear the area. It was during that movement that the [trailer] struck the support beam which, in turn, struck and injured [the plaintiff]. Indeed, [the defendant] admitted that in operating the yard truck he was directing and controlling the movement of the [trailer] and that [the plaintiff] was injured as a result of his moving the unit."

The defendant relies on *Surprenant* v. *Burlingham*, supra, 64 Conn. App. 409, in arguing that the plaintiff has failed to establish operation of a motor vehicle;

however, the facts of that case are inapposite to the case at bar. We agree with the trial court's distinction as set forth in its memorandum of decision: "The defendant [in *Surprenant*] was operating a front end loader (payloader), while towing a dump truck in an attempt to jump start the truck. The plaintiff was in the cab of the [dump] truck, which was attached to the payloader by a metal chain. The chain snapped while the payloader was towing the truck, crashed through the windshield of the truck and injured the plaintiff. . . . Since the parties agreed that the payloader was not a 'motor vehicle' and the dump truck was, the question was whether the defendant was 'operating' the truck while he towed it with the payloader. The Appellate Court concluded that he was not [operating the truck] because he was not steering or directing the course of the truck; the plaintiff was. . . . In [the present] case no one but [the defendant] was directing and controlling the movement of the [trailer] when it struck the beam which injured [the plaintiff]." (Citations omitted.) We, therefore, conclude that the court properly construed § 31-293a, as applied to the facts in this case, and properly determined that the plaintiff was injured due to the defendant's negligence in the operation of a motor vehicle.

The judgment is affirmed.

In this opinion the other judges concurred.